# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3409

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| Iggy Santisteban, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: May 17, 2007
Filed: September 7, 2007 **(Corrected 9/17/07)**

_____

Before MURPHY, HANSEN, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

After a four-day trial, a jury convicted Iggy Santisteban of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371. The district court[1] sentenced Santisteban to a prison term of thirty-seven months. Santisteban appeals several of the district court's rulings at trial, and we affirm.

_____

[1]The Honorable Ortrie D. Smith, United States District Judge for the Western District of Missouri.

## I.

Santisteban was involved in an international conspiracy to manufacture and distribute counterfeit prescription drugs. The conspiracy involved importing, manufacturing, and misbranding prescription drugs. Santisteban's printing business produced labels for the counterfeit drugs, and accepted payment from the other conspirators for the fraudulent labels.

Santisteban's defense at trial was that his participation was unwitting. The central figure of the conspiracy was Julio Cruz, a former cocaine dealer, whose cooperation with the government in an unrelated case had enabled him to leave prison early. After securing his release, Cruz, with the assistance of two men he had met in prison, began smuggling prescription drugs into the United States from Central and South America. The conspiracy also involved the theft and unauthorized manufacture of prescription drugs.

Before meeting Cruz, Santisteban owned a struggling printing business in South Florida, known as Iggyprints. A mutual friend introduced Cruz to Santisteban, and at this meeting, Cruz asked Santisteban if he could reproduce a label for Pfizer's anti-cholesterol drug Lipitor. After stating that he could re-print the label, Santisteban quoted a price for printing labels, at about 50% above what he typically would have charged. Cruz immediately agreed. Cruz testified that Santisteban requested a purchase order, or some other documentation, to authorize his reproduction of the labels. When FDA agents initially questioned Santisteban, he told them that he had received a letter on Pfizer stationery authorizing him to go ahead with the print job, but he could not retrieve this document for the agents. Later, he produced a letter written on Pfizer letterhead, although the heading indicated that it was from Pfizer in Brazil, and the text of the letter merely requested "a competitive quote," not the printing of labels. Santisteban eventually printed over forty different drug labels at Cruz's direction, including labels for non-Pfizer drugs. Santisteban came to the

attention of law enforcement during the course of an investigation into counterfeit Lipitor and Lipitor labels.

The jury convicted Santisteban of conspiring to defraud the United States. The theory of the prosecution was that the conspiracy evaded the Food and Drug Administration's regulatory control and thus defrauded the United States. The district court sentenced Santisteban to a term of thirty-seven months' imprisonment, and ordered restitution of $1,806,905 to Pfizer.

## II.

### A.

Santisteban's first contention is that the government violated his rights under the Due Process Clause by failing to disclose certain impeachment evidence. Before trial, the government disclosed to the defense a prosecution memorandum, which outlined the government's case. Santisteban argues that the government violated his rights by refusing to disclose certain investigative reports that provided the basis for portions of the memorandum.

Santisteban's defense was that he believed Cruz to be a legitimate businessman, and that he relied on the Pfizer letter as authorization for the reproduction of labels for Pfizer drugs. At trial, however, Cruz testified that Santisteban had requested the letter merely to "cover his ass," and not because he believed it actually authorized the reproduction of labels. Cruz testified that he gave Santisteban the letterhead, which included a signature, but that the body of the letter was blank when he gave the letterhead to Santisteban. On cross-examination, Cruz testified that Santisteban had forged and backdated the body of the letter.

Contrary to Cruz's testimony, however, the prosecution memorandum suggests that Santisteban did not forge the body of the letter from Pfizer. Instead, it states that Pablo Fernandez, one of Cruz's associates, "created a fake/forged authorization letter . . . and Cruz furnished it to Santisteban." When Santisteban sought discovery of agent reports of Cruz's statements, believing that these would reveal the source of the apparent inconsistency, the government refused to provide them. The district court rejected Santisteban's claim that the prosecution memorandum provided a foundation for further discovery, concluding that there was no clear inconsistency between the prosecution memorandum and Cruz's testimony. Cruz had testified that he had provided the letterhead, and that Santisteban forged the body of the letter and backdated it. The court reasoned that the prosecution memorandum may have referred only to the creation of the letterhead, and not to the forgery of the body of the letter.

The Due Process Clause of the Fifth Amendment requires the government to disclose to the accused favorable evidence that is material to guilt or punishment and not otherwise available to the defendant. *See United States v. Bagley*, 473 U.S. 667, 678 (1985); *Brady v. Maryland*, 373 U.S. 83, 87 (1963). To prove a violation, the defendant must show that the evidence was both favorable and material, and that the government suppressed the evidence. *United States v. Barraza-Cazares*, 465 F.3d 327, 333 (8th Cir. 2006). The government has suppressed evidence when it was otherwise unavailable to the defendant, and the prosecution failed to disclose the evidence in time for the defendant to use it. *Id.* at 334. Thus, "[t]he government does not suppress evidence in violation of *Brady* by failing to disclose evidence to which the defendant had access through other channels." *United States v. Zuazo*, 243 F.3d 428, 431 (8th Cir. 2001).

Santisteban argues that the government violated the *Brady* rule by refusing to provide him with the agent reports that were the basis for the memorandum's assertion that Fernandez, and not Santisteban, forged the letter from Pfizer. We agree with Santisteban that the substance of the memorandum was inconsistent with Cruz's

testimony on this point.  Nonetheless, we conclude that Santisteban's due process claim fails, because he has not demonstrated that the requested information was material to the defense or that it was unavailable to him through other channels.

We observe first that although counsel cross-examined Cruz regarding the authorship of the letter, he never confronted Cruz with the reported inconsistent statement set forth in the prosecution memorandum.  This is significant for two reasons.  First, if Cruz had been asked whether he told the government that Fernandez created the letter, then Cruz may have admitted the prior inconsistent statement, and the desired impeachment would have been accomplished.  Santisteban did not exhaust this readily available avenue to present evidence of the inconsistency.  Second, before Santisteban could have offered extrinsic evidence of a prior statement by Cruz (presumably through the agent whose identity he sought), he was required by the rules of evidence to afford Cruz an opportunity to explain or deny the statement.  Fed. R. Evid. 613(b).  Having failed to lay a proper foundation for admission of the extrinsic evidence, Santisteban is hard pressed now to demonstrate that the unavailability of the extrinsic evidence was prejudicial to his defense.

Santisteban also failed to pursue another readily available channel to determine the source of the information in the prosecution memorandum.  The defense presented at trial a recording of FDA Agent Spencer Morrison questioning Cruz about the Pfizer letter.  The cross-examination of Cruz revealed that he had spoken with Morrison on multiple occasions during the course of his cooperation.  Later in the trial, the defense even called Morrison as a witness, but failed to question him about Cruz's prior statements concerning the Pfizer letter.  We think it is highly likely that Morrison, as an FDA agent known to have discussed the letter with Cruz and to have communicated with him several times during the investigation, was in a position either to confirm that he was the source of the information in the prosecution memorandum, or to identify another investigator who reported the statement.  Yet Santisteban did not broach the topic with Morrison.  In view of the opportunity to examine this

investigating agent on the topic, we do not believe the requested information about Cruz's prior statement to the government was unavailable to Santisteban. *See Hoke v. Netherland*, 92 F.3d 1350, 1355 (4th Cir. 1996) ("While it cannot be known with absolute certainty, it is quite likely that, had Hoke undertaken a reasonable investigation, he would have learned of all three of the men in question and of their relations with Stell.").

In addition, even assuming the requested information was improperly suppressed, we do not believe it was material. Evidence is material if there is a reasonable probability that it would have altered the jury's verdict. *Bagley*, 473 U.S. at 682. At most, the revelation that Cruz made the prior inconsistent statement would have permitted the defense to present evidence impeaching Cruz's statement that Santisteban forged the body of the letter. But Cruz already was heavily impeached with evidence of his criminal history, his plea agreement, and his penchant for false statements and manipulation of others. The effect of one more piece of impeachment evidence on the jury's evaluation of Cruz's credibility likely would have been slight.

The value of the proposed impeachment, even viewed in isolation, also strikes us as minimal. Even if the jury questioned whether Santisteban forged the Pfizer letter himself, Santisteban's reliance on the letter was dubious on its face. The jury would have been left to evaluate a contention that Santisteban relied on a letter, given to him by Cruz, that merely requested a price quotation, as an "authorization" from a major corporation to reproduce Pfizer labels. We are not persuaded that the inability further to impeach Cruz's account of how this letter was created was material to the defense.

B.

Santisteban next argues that the district court should have allowed him to present the government's prosecution memorandum as evidence that Fernandez had forged the letter. He maintains that the statement in the memorandum that "Fernandez

-6-

created a fake/forged authorization letter" is an admission by the government, and thus is not hearsay. Fed. R. Evid. 801(d)(2). The district court rejected this argument, concluding that the statement was not an admission and noting the "serious implications in allowing a defense attorney to use the statement from a [prosecution] memo as an admission." (T. Tr. 729-30). Citing the need for parties to exchange information freely, the court feared that admitting the statement in the memorandum would deter the exchange of such information in the future.

We conclude that the statement in the prosecution memorandum is inadmissible hearsay. Because the government employee who authored the memorandum could not have had personal knowledge as to who created the letter from Pfizer, the author was in no position to "admit" that Fernandez had forged the document. Rather, the statement in the prosecution memorandum recounts an investigator's report of Cruz's statement that Fernandez created the document. The paragraph thus appears to contain three levels of potential hearsay: (1) the out-of-court statement of the author recorded in the memorandum, (2) the statement of the investigator to the author (*i.e.*, that Cruz made a particular statement to the investigator), and (3) the statement of Cruz to the investigator (*i.e.*, that Fernandez had created the document). Unless all three levels are admissible, the statement in the prosecution memorandum cannot be admitted for its truth. Fed. R. Evid. 805; *United States v. Taylor*, 462 F.3d 1023, 1026 (8th Cir. 2006). Even if the first level – the author's out-of-court statement – is viewed as an admission of a party opponent, and thus non-hearsay, *see* Fed. R. Evid. 801(d)(2), the second and third levels of hearsay are not covered by any hearsay exception. *Taylor*, 462 F.3d at 1026. Therefore, the memorandum's recounting of the witness's statement cannot be admitted for its truth.

C.

Santisteban next alleges a violation of his right to confront Cruz, whom the district court described as a "key" witness, and a violation of his due process rights

arising from non-disclosure of certain "proffer letters" between Cruz and the government. We review these constitutional claims *de novo. United States v. Kenyon*, 481 F.3d 1054, 1063 (8th Cir. 2007); *Mandacina v. United States*, 328 F.3d 995, 1001 (8th Cir. 2003).

Santisteban argues that the district court erred in refusing to allow cross-examination of Cruz regarding a pending state prosecution in Florida. Santisteban argues that the district court should have permitted him to attack Cruz's credibility with these pending charges. In Santisteban's view, because the Florida prosecution was still pending, Cruz had even more reason to incriminate Santisteban in an effort to please prosecutors. Santisteban also points out that Cruz's federal plea agreement explicitly requires Cruz to cooperate with state authorities.

We conclude that any error was harmless. To determine whether a Confrontation Clause error was harmless, we look to "whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). In a particular case, this inquiry depends on "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Id.* In this case, we find it dispositive that Santisteban's counsel was able to show Cruz's bias without addressing the pending prosecution in Florida.

Santisteban's counsel subjected Cruz to a withering cross-examination. Cruz admitted to being a convicted felon and former cocaine dealer. He also stated that, when conducting his affairs, it was common for him to lie under oath. Cruz further admitted that he had entered into prior cooperation agreements, which enabled him to

leave prison early and mastermind this conspiracy. Cruz conceded that he had received a "pretty good deal" by pleading guilty and agreeing to testify in this case, that his sentence could be reduced as a result of his testimony for the prosecution, and that he hoped the government might even release him on bond. Cruz admitted that he often "use[d] people" when doing so would benefit him.

Based on this cross-examination, we conclude that Santisteban had little to gain from cross-examining Cruz about the pending prosecution in Florida. By this point, the jury surely understood that Cruz hoped to benefit from incriminating Santisteban, and that Cruz had a long history of deceit. Even if Cruz's cooperation were expected to secure the dismissal of the charges in Florida, this marginal difference in benefit would not have cast further doubt on Cruz's testimony. With or without the pending prosecution in Florida, there was abundant evidence that Cruz had a strong incentive to satisfy law enforcement with his testimony. Therefore, any error in excluding this evidence was harmless beyond a reasonable doubt.

Santisteban also complains that the government did not disclose the proffer letters from the government to Cruz that preceded Cruz's plea agreement. The government acknowledges that these letters provided use immunity for statements made by Cruz during his initial cooperation, before he reached a formal plea agreement with the United States Attorney. *See United States v. Lopez*, 219 F.3d 343, 345 n.1 (4th Cir. 2000). Once the plea agreement was signed, the terms of that agreement superseded the terms of the preliminary proffer letters concerning the use of Cruz's statements.

Santisteban alleges that the non-disclosure of the proffer letters violated his due process right to receive exculpatory or impeachment evidence. He contends that these letters would have cast further doubt on Cruz's veracity. At trial, Cruz testified that he had cooperated with prosecutors out of a genuine desire to help the investigation, and not solely for his own benefit. Santisteban asserts that this testimony was

misleading, because the jury did not know that before cooperating with investigators, Cruz had been arrested in Florida on charges related to this conspiracy. Had the jurors known about the proffer letters governing this initial cooperation, Santisteban contends, they would have recognized that Cruz cooperated not out of the goodness of his heart, but to receive a reduced sentence for his role in the conspiracy. The district court declined to compel the production of these letters, because the government had already provided Cruz's plea agreement, and the terms of the letters were "subsumed within the final agreements between the Government and witnesses."

Because the final plea agreement superseded the antecedent proffer letters, *see United States v. Davis*, 393 F.3d 540, 546 (5th Cir. 2004), we believe the government satisfied its obligations under the Due Process Clause by providing Cruz's plea agreement to Santisteban. Regardless of any preliminary proffer agreements, the formal plea agreement governed Cruz's cooperation, and it provided the jury with a sufficient basis for judging the credibility of Cruz's testimony at trial. The government disclosed the plea agreement, and Santisteban was able to cross-examine Cruz vigorously about it. Santisteban also was free to elicit from Cruz that he received use immunity for statements made during his proffer sessions with the government. Santisteban argues that the proffer letters themselves would have cast doubt on Cruz's testimony that his cooperation was purely altruistic, but even if this information was not otherwise readily available through cross-examining Cruz, the government's agreement to grant preliminary use immunity is a collateral issue. Whether Cruz's initial cooperation was altruistic or self-interested is relevant only to the extent that it casts doubt on his testimony at trial. The terms of Cruz's plea agreement provided Santisteban with sufficient basis to show Cruz's potential bias and to question his credibility at trial. The terms of the proffer letters were not material to the defense.

D.

Santisteban challenges the district court's failure to instruct the jury as to any lesser-included offenses. He cites two potential lesser-included offenses: misusing a label required by federal regulations, 21 U.S.C. § 331(i)(1), and "[t]he doing of any act which causes a drug to be a counterfeit drug," as prohibited by § 331(i)(3). The government maintains that these offenses require proof of an additional element not needed to prove a conspiracy to defraud the United States.

A defendant is entitled to a jury instruction if the request is timely, the evidence supports the instruction, and the proffered instruction correctly states the law. *United States v. Sanders*, 834 F.2d 717, 719 (8th Cir. 1987). In this case, the proffered instructions correctly state the law only if violations of §§ 331(i)(1) and (3) are indeed lesser-included offenses of 18 U.S.C. § 371. "To be a lesser-included offense, a crime must not require the government to prove any additional elements." *United States v. Hatcher*, 323 F.3d 666, 672 (8th Cir. 2003). Thus, where the lesser offense "requires an element not required for the greater offense, no instruction is to be given." *Schmuck v. United States*, 489 U.S. 705, 716 (1989).

The jury convicted Santisteban of conspiring to defraud the United States under 18 U.S.C. § 371, and this was the only offense submitted to the jury. The elements of this offense required the jury to find that Santisteban knowingly entered into an agreement or understanding to defraud the FDA by taking steps, through means that involved dishonesty, deceit, craft, or trickery, to impede, impair, obstruct, or defeat a lawful function of the FDA. (Appellant's App. 129). Each of the offenses that Santisteban claims to be lesser-included required an additional element of proof. To prove a violation of 21 U.S.C. § 331(i)(1), the government must show that the defendant fraudulently used a "label . . . authorized or required by [federal regulations]." *Id.* Section 331(i)(3) requires proof that the defendant's act caused a drug to be a counterfeit drug. Santisteban could be convicted under § 371 without

-11-

proof of these additional elements. Accordingly, neither of the offenses found in § 331(i) is a lesser-included offense of conspiring to defraud the United States, and the district court properly declined to give the requested instructions.

Santisteban's final argument is that the district court erred by refusing to give a multiple conspiracy instruction. He maintains that the criminal conspiracy in this case involved multiple criminal purposes, some of which were not known to him. *See United States v. Zimmerman*, 832 F.2d 454, 458 (8th Cir. 1987) (a conviction for conspiracy requires proof that the defendant was "aware of the general nature and scope of the conspiracy"). The government contends that the evidence in this case sufficed to prove a single conspiracy.

"If the evidence supports a single conspiracy, the failure to give a multiple conspiracy instruction is not reversible error." *United States v. Roach*, 164 F.3d 403, 412 (8th Cir. 1998). "Whether a given case involves single or multiple conspiracies depends on whether there was one overall agreement to perform various functions to achieve the objectives of the conspiracy." *United States v. Radtke*, 415 F.3d 826, 838 (8th Cir. 2005) (internal quotations omitted). That the conspirators entered the conspiracy at different times and played discrete roles does not compel a finding of multiple conspiracies. *United States v. Maza*, 93 F.3d 1390, 1398 (8th Cir. 1996). Because this is a factual issue, we draw all reasonable inferences in favor of the verdict. *Radtke*, 415 F.3d at 838.

The evidence at trial established that Santisteban played a small, but essential, role in a single conspiracy. Cruz identified Santisteban as the person he "hired to print the labels that were used and distributed as part" of the criminal conspiracy. (T. Tr. 287-88). Throughout Cruz's testimony, he referred to a single conspiracy centered around Cruz's illicit dealings. Santisteban argues that the conspiracy had several purposes, citing "importing drugs, manufacturing drugs, misbranding drugs, and defrauding the FDA." Santisteban's involvement, however, touched on each aspect

-12-

of the conspiracy. Cruz testified that Santisteban printed labels for over forty different drugs, suggesting that Santisteban was well aware of the scope of the conspiracy. Moreover, "a conspiracy with multiple objectives is not the same thing as multiple conspiracies." *Radtke*, 415 F.3d at 839. Cruz's testimony that Santisteban agreed to print labels for the conspiracy provides sufficient evidence for a jury to conclude that there was a single conspiracy.

*     *     *

For the foregoing reasons, the judgment of the district court is affirmed.

_____